14-463

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

(0:11-CV-02395-JFA)

**STEVE RANDALL SMITH**

**Plaintiff-Petitioner**

**v.**

**N.C. MURPHY; CHARLES GRANT; T.J. MURPHY; and ALEX UNDERWOOD**

**Defendants**

## PETITION FOR INTERLOCUTORY APPEAL

### (A) Procedural History

Petitioner Smith, the plaintiff in the District Court, filed an action against the defendants alleging false arrest and excessive force under both federal and state law. The District Court granted summary judgment to the defendants on Plaintiff's 42 U.S.C. § 1983 and state law false arrest claims finding there was probable cause as a matter law to arrest Mr. Smith for assault and battery. The court alternatively found that if probable cause did not exist the deputies were nonetheless entitled to qualified immunity on the § 1983 claim and should be dismissed as defendants. The finding of probable cause to

1

arrest negated an essential element of both causes of action. (Att. 1, Docket Entry 102 - Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment, Pp.7-8).

In the same order the court denied summary judgment to the defendants on the 42 U.S.C. §1983 excessive force and state law battery claims including the defendant deputies' qualified immunity defense. (Att. 1, Pp. 8-9). As a result, the deputies have taken an interlocutory appeal as provided by *Mitchell v. Forsyth,* 472 U.S. 511, 530 (1985) which is currently pending in this court. *Smith v. Murphy*, No. 14-1918.

Subsequently, Plaintiff moved before the district court to certify the false arrest federal and state causes of action for interlocutory appeal pursuant to 28 U.S.C. §1292(b). The district court granted the motion and certified the false arrest claims for interlocutory review on October 9, 2014, thereby conferring jurisdiction on this court to entertain discretionary review under its pendent appellate jurisdiction. The district court found the issue of probable cause on the false arrest claims was 1) a controlling question of law to which there is a substantial ground for difference of opinion and 2) the granting of the immediate appeal would materially advance the ultimate termination of this litigation. The court also noted the case was already before this court on the defendants' qualified immunity interlocutory appeal

2

and the resolution of all issues would promote the efficient termination of the litigation.

**(B) Facts Necessary to understand the question presented:**

The claims in this case arose out of an altercation between two racecar drivers who were participating in the annual Shrine Race at the I-77 Speedway, a dirt track raceway in Chester, South Carolina. It is undisputed by the parties that during the race, Plaintiff passed driver Chad Paxton and that Paxton then ran his car into the right rear quarter panel of Plaintiff's car, driving it into the wall and disabling it. As a result, Plaintiff was not able to finish the race. When Plaintiff went back to his pit area, he decided to approach Paxton to state his disappointment with Paxton's racing maneuver and ask him why he had done it. He walked from his pit area to the scale area used to weigh cars when they win races to ensure that they are within the allowable weight range. Accompanying Plaintiff was two of his crewmembers, Alan Barfield and Clint McAteer. They arrived at the scale area seven or eight minutes before Paxton's car finished the heat and pulled into the area. (Att. 2: Hearing Transcript, P. 26).

Defendants claim that during Plaintiff's walk from his pit area to the scale area Defendant T.J. Murphy, intercepted him and implored him not to start any trouble and not to continue his walk to the scale area. T.J.

3

Murphy's assertion that he attempted to reason with Plaintiff in order to prevent trouble is refuted by all other witnesses who were in the area. (Docket Entry 87-2, P. 88; Docket Entry 87-12, P. 18). Indeed, crew members McAteer and Barfield, who walked with Plaintiff the entire way from his pit area to Paxton's car, both say that no one interacted with Plaintiff, no one talked to or attempted to talk with Plaintiff, and neither of them witnessed any law enforcement officer talk with or attempt to talk with Plaintiff. (Docket Entry 87-13, P. 18; Docket Entry 87-10, Pp. 15-16). Barfield says he did not see any law enforcement officer until Plaintiff was attacked by T.J. Murphy.

No racetrack official alerted the officers that Plaintiff was going to cause trouble. T.J. Murphy has stated that a racetrack official by the name of Charles Johnson alerted him that Plaintiff was going to cause an incident. When questioned about this in his deposition, he admitted that this alleged witness "wasn't specific". He went on to concede that his inference from this alleged witness was based on the mere statement that there had been a wreck. And he said that there was nothing in the alleged official's remarks specifically about Plaintiff. (Docket Entry 87-5, Pp.70-71). During discovery in the case, Defendant's counsel conceded that they could locate no such witness, and they could not produce him for a deposition. A

4

reasonable inference from these factual developments is that "Charles Johnson" does not exist. Indeed, not a single person associated with the tracks, any of the race teams, vendors or fans was able to identify a racetrack official named Charles Johnson. Moreover, the assertion that any such person interacted with Plaintiff is contradicted by the testimony of the Plaintiff, Barfield, McAteer, and others. Moreover, Bill Murphy, T.J. Murphy's supervisor and father, did not see any interaction between T.J. Murphy and the alleged track official. (Docket Entry 87-4, P. 54) This is clearly a disputed fact.

No radio transmission alerted the defendants to any potential problem or violence. The radio transmission merely reported that there was a caution flag after the wreck on the track. (Docket Entry 87-6, P. 26). The officers could not communicate over the radios. They could only listen to what was broadcast by the track announcer. (Docket Entry 87-9, P. 52). Every single witness who saw the incident at Paxton's car, except T.J. Murphy, says that after Paxton pulled into the scale area, Plaintiff approached the driver's window of Paxton's car. (Docket Entry 87-2, P. 64). Smith leaned down, because the race cars are very low to the ground. (Docket Entry 87-2, Pp. 66, 68) As he was trying to express his disappointment to Paxton for the racing maneuver he had engaged in, officers who had not identified themselves

5

assaulted him.  The defendants approached him from his rear and he never saw a single officer until he was attacked.  He was hit in the back of the head, knocked to the ground, kicked, beaten and choked.  Smith had previous surgery on his right shoulder, and pled with the officers not to pull on his right shoulder, to which Bill Murphy replied, "Give me your arm mother fucker."  He put his hands to his sides for protection, since one of the officers was kicking him in the ribs.  He pleaded with one of the officers "[M]an, cut it out, its hurting."  (Docket Entry 87-2, Pp. 64-73).

Scottie Watts was part of another race team was in close proximity and had a clear view of the incident at Paxton's car.  He said that Plaintiff "was just pointing, you know.  He never got into the window of the other boy's car or anything."  He says that there were people around but no one was yelling.  (Docket Entry 87-15, Pp. 12-13).  He says that he never saw Plaintiff attempt to hit Paxton.  He also says that Paxton still had on his helmet. Plaintiff's hands did not break the plane of Paxton's window.  An officer "came running out of the scale area.  That's the one that come flying down through there and slammed him to the ground.  I mean he just came flying out there. He never – I mean he just came flying out there. He never – I didn't see where he tried to grab him and say, hey, this is the police get back or nothing.  He just...grabbed him and slammed him to the ground."

6

He says that Plaintiff did not try to resist and that the officer approached the Plaintiff from his "blind side". He says the officer "never broke his stride" and "just leveled him." (Docket Entry 87-15, Pp.16-18, 22, 27). Four other witnesses John Paige, Clint McAteer, Alan Barfield, and the track owner Mosley all provided similar testimony.

### (C) The Question Presented

Does pointing a finger at another driver in the context of a car race establish probable cause to arrest him for assault and battery or alternatively entitle the defendants to qualified immunity on both the federal and state false arrest claims?

### (D) The Relief Sought

Petitioner seeks to have the trial court reversed on the finding of probable cause and remand the case back to the district court for trial on both federal and state law false arrest claims so that they may be tried with the excessive force claim.

### (E) The reasons why the appeal should be allowed and is authorized by a statute or rule

In enacting 28 U.S.C. § 1292(b) Congress established a procedural mechanism that would allow non-final district court orders to be heard on an interlocutory basis under certain circumstances. If the district court makes a finding that a ruling involves "a controlling question of law as to which there

7

is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation", the district court can issue an order certifying the ruling for interlocutory review.

This order confers jurisdiction on the appellate court to exercise its discretionary authority to review the ruling otherwise not immediately appealable. *Swint v. Chambers County Comm'n.* 514 U.S. 35, 47 (1995)("Congress thus chose to confer on district courts first line discretion to allow interlocutory appeals."). As noted by the Supreme Court in *Swint,* at U.S. 47, ftnt 4. the Fourth Circuit has "recogniz[ed] pendent appellate jurisdiction if the issues involved in the two rulings substantially overlap and review will advance the litigation or avoid further appeals." citing *Roberson v. Mullins*, 29 F.3d 132, 136 (CA4 1994) (internal quotation marks omitted).

**The grant of summary judgment on the false arrest claim is a controlling question of law as to which there are substantial grounds for a difference of opinion.**

As the district court acknowledged in certifying the false arrest claim for interlocutory appeal, it's finding there was probable cause to arrest Mr. Smith is a controlling question of law that defeats both the federal and state cause of action for false arrest. The court further found there was a

8

substantial ground for a difference of opinion on this issue. (Att. 3: Order for Interlocutory Appeal).

The central disputed issue on the 4th Amendment illegal arrest claim is lack of probable cause. The question is whether the evidence taken in a light most favorable to Mr. Smith allows a reasonable jury to conclude there was not probable cause to arrest him for assault and battery. "In the criminal arrest context, probable cause exists where the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the defendant had committed an offense." *Cloaninger v. McDevitt*, 555 F.3d 324, 334 (4th Cir. 2009). To assess whether probable cause existed a court looks at the state crime alleged to have been committed. South Carolina's common law defines simple assault as "an unlawful attempt, coupled with a present ability, to commit a violent injury upon the person of another". A battery is the successful accomplishment of such attempt. *State v. Jones*, 133 S.C. 167 (1923). An attempt to commit a misdemeanor is not a crime in South Carolina. *State v. Redmon*, 121 S.C. 139 (1922). This law has remained the same in South Carolina for almost a century and is clearly established for purposes of notice to the officers. There is nothing legally ambiguous about this standard.

Taken in a light most favorable to the plaintiff, Mr. Smith calmly walked over to the scale area with other crewmembers. When Mr. Paxton's car arrived in the scale area, he approached the car and pointed his finger at Mr. Paxton complaining of his driving that caused the wreck. This all occurred in the "context" of a sporting event. Like with all sporting events disagreements between participants are part and parcel of the contest. One driver going up to another to discuss actions on the track is both normal and appropriate. According to Paxton, when Smith approached him all he could see was Smith pointing a finger. Smith's hands never entered his car past the wrist and Smith "never touched me." (Docket Entry 87-14, Pp. 20-21). Not only does Paxton say that Smith never touched him, he says he was never in fear, "never worried." (Docket Entry 87-14, P. 23). A jury could conclude there was not probable cause to believe that pointing a finger and talking to him was probable cause to believe "an unlawful attempt, coupled with a present ability, to commit a violent injury upon the person of another and the completion of that act." The deputies claim Plaintiff grabbed and shook Paxton's helmet; however, Paxton and Smith, the two individuals closest to the events, say that did not happen. A jury has to resolve this dispute.

10

In an effort to avoid the genuine disputes of fact the defendants suggest the law is governed by what the reasonable officer perceived (not what actually happened) and that they had arguable probable cause. Defendants have listed a series of facts that they say were reasonably perceived by the officers. This is an attempt to circumvent factual disputes and define the context of the facts so as to ignore these disputes. They argued and the court accepted that simply by saying they perceived they got a communication about potential trouble and that Smith was about to hit Paxton negates the reality that there is evidence that no such communication ever occurred.

By way of further example, Defendants' claim they reasonably perceived that Smith was threatening to hit Paxton. They assert the actual fact that Paxton was not hit is irrelevant and there is no dispute about what they perceived. *See Sevigny v. Dicksey*, 846 F.2d 953,957 n. 5 (4th Cir. 1988) ("Objective inquiry into the reasonableness of an officer's perception of the critical facts leading to an arrest . . . must charge him with possession of all the information reasonably discoverable by an officer acting reasonably under the circumstances. Indeed his subjective beliefs about the matter, however induced, are actually irrelevant to the inquiry.")

11

This argument is similar to one rejected in *Tolan v. Cotton*, 134 S. Ct. 1861 (2014) (per curiam) for using the summary judgment standard in qualified immunity context improperly. "Third, the Court concluded that Tolan was "shouting," 713 F. 3d, at 306, 308, and "verbally threatening" the officer, *id.*, at 307, in the moments before the shooting. The court noted, and the parties agree, that while Cotton was grabbing the arm of Tolan's mother, Tolan told Cotton, "[G]et your fucking hands off my mom." Record 1928. But Tolan testified that he "was not screaming."" *Id.*, at 2544. And a jury could reasonably infer that his words, in context, did not amount to a statement of intent to inflict harm. Cf. *United States* v. *White*, 258 F. 3d 374, 383 (CA5 2001) ("A threat imports `[a] communicated intent to inflict physical or other harm." (quoting Black's Law Dictionary 1480 (6th ed. 1990).

The district court accepted the defendant's perspective that verbally scolding and wagging a finger at another driver during the course of a race establishes probable cause to arrest someone for assault and battery. The district court found:

> On this record, the court determines that the law enforcement officers had probable cause to arrest the plaintiff for assault and battery. While the precise events following the collision on the track are sharply in dispute, it can be argued that plaintiff, by his own admission, was extremely upset after the accident and was quite obviously headed directly toward Paxton's car in an

effort to voice his displeasure. Whether he was partially inside of Paxton's car as the officers contend, or merely outside of the car making menacing gestures, the officers had probable cause to arrest him for at least an assault. For this reason, the court will grant summary judgment to the defendants on the § 1983 false arrest claim.

Contrary to the holding in the lower court, the issue properly evaluated under *Tolan* would find a jury could reasonably infer that wagging a finger was not "menacing " and was not "an immediate threat with present ability to inflict violent injury and the completion of that act " and therefore he had committed no crime justifying his arrest.[1]

**An immediate appeal of the order is appropriate as the legal issues overlap and hearing the matter would avoid future appeals.**

As noted by the Supreme Court in *Swint*, at U.S. 47, ftnt 4., the Fourth Circuit has "recogniz[ed] pendent appellate jurisdiction if the issues involved in the two rulings substantially overlap and review will advance the litigation or avoid further appeals." citing *Roberson* v. *Mullins*, 29 F.3d 132, 136 (CA4 1994) (internal quotation marks omitted); This matter is appropriate for immediate review in light of the defendant's interlocutory appeal. "The same practical considerations for avoiding piecemeal appeals

---

[1]Plaintiff relies on his written response (Docket Entries 86 & 87) and arguments made during the hearing on the summary judgment motion (Docket Entry 101) to show there are substantial grounds for a difference of opinion whether probable cause exists and whether qualified immunity should be granted.

that underlie the final order doctrine instruct that when an appeal is otherwise warranted on a single issue, we may review all issues that the parties raise and which are reasonably related when that review will advance the litigation or avoid further appeals. Under the doctrine of pendent appellate jurisdiction, once we have taken jurisdiction over one issue, we may consider others that overlap." *O'Bar v. Pinion*, 953 F.2d 74, 80 (4th Cir. 1991); Accord *Jackson v. Long*, 102 F.3d 722 (4th Cir. 1996

"Although pendent appellate jurisdiction must be exercised cautiously, it is frequently appropriate on review of a denial of qualified immunity, …." *Akers v. Caperton*, 998 F.2d 220, 223 (4th Cir. 1993).  As noted in *Henry v. Purnell*, 501 F.3d 374, 377 (4th Cir. 2007) a court of appeals' jurisdiction "over an interlocutory appeal of the denial of qualified immunity also provides a basis for consideration of other district court rulings that are `inextricably intertwined' with the decision of the lower court to deny qualified immunity or when consideration of the additional issue is necessary to ensure meaningful review."

Other courts focus on the intertwined nature of the claims. *Mendocino Enviro. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1296 (9th Cir. 1999) "In deciding whether the rulings are inextricably linked, we conduct a preliminary review of the issues and consider the non-frivolous contentions

14

of the parties, rather than first resolving the merits and then determining whether the rulings are inextricably linked."

*McEvoy v. Spencer*, 124 F.3d 92, 96 (2nd Cir. 1997). The resolution of this question "entails an inquiry into the nature and extent of the rights that [McEvoy] can assert, and whether [his] entitlement is well-settled." *Kaluczky*, 57 F.3d at 207. Because these underlying issues are "inextricably intertwined" with the qualified immunity issue, or are "necessary to ensure meaningful review" of that issue, *Swint v. Chambers County Commission*, 115 S. Ct. 1203, 1212 (1995), we have discretion, on this interlocutory appeal, to exercise pendent jurisdiction over these related questions.

*Jewett v. Anders*, 521 F.3d 818, 828 ftn 5 (7th Cir. 2008) "Our jurisdiction necessarily must extend to review of the district court's exclusion as inadmissible hearsay of Officer Anders' testimony regarding the information that he received from his superiors when he was dispatched to the Wal-Mart to apprehend Andre Thompson. That issue is intertwined with the issue of qualified immunity, and its consideration is "necessary to ensure meaningful review of the qualified immunity question."

**The false arrest issue overlaps and is intertwined with the excessive force claim both factually and legally.**

Factually, the arrest and the use of force occurred simultaneously as the deputies tackled Mr. Smith and forcefully restrained him. As noted by

15

the district court there is no practical way to present the excessive force case without directly dealing with the arrest and the presentation of the same evidence at trial. (Att. 2, Hearing Transcript, P. 44). All the parties in the current appeal are involved in the additional issue raised by this petition.

The causes of action are legally intertwined because under *Graham v. Conner* 490 U.S.386, 396 (1989), whether the plaintiff committed a crime is a significant factor in determining whether the amount of force being used is unreasonable. If the plaintiff "committed no crime this factor weighs heavily in" plaintiff's favor. *Bailey v Kennedy*, 349 F3d 731,744 (4th Cir. 2003). The overlapping causes of action makes the case particularly appropriate to be reviewed simultaneously by an appellate court.

Finally, both the excessive force issue currently on appeal and the false arrest issue will involve application of the recent the *Tolan* decision and its' role in resolving issues of qualified immunity on summary judgment. Here the district court improperly applied the summary judgment standard by ignoring disputed facts or inferences that created a material dispute of fact precluding summary judgment.

**Immediate review of the false arrest claim would efficiently use court resources and avoid future appeals.**

Should this court affirm the denial of summary judgment on the excessive force claim, the case would be remanded back to district court for

trial. Regardless of the outcome of that trial, Plaintiff would be able to appeal the court's granting of summary judgment on the false arrest claim and\or the defendants could appeal a verdict in Plaintiff's favor. If that ruling or any trial error causes reversal on the second appeal, a second trial would be necessary. At the conclusion of the second trial, either party would be entitled to appeal the verdict. Not only would this be the third appeal in one case, it could conceivably lead to a third trial based on a trial error affecting the verdict.

By contrast in certifying the case for immediate appeal this court would have the opportunity to; 1) affirm the district court's decision in full thereby returning the case to the lower court for one trial and a potential second appeal; 2) reverse the court on both rulings thereby again returning the case to the lower court for one trial and a potential second appeal; or 3) the court could affirm denial of summary judgment on the excessive force and reverse the court on the false arrest claim thereby once more returning the case to the lower court for one trial and a potential second appeal and finally; 4) the court could affirm the grant of summary judgment on the false arrest claim and reverse the ruling on the excessive force case thereby ending the litigation. Under all these scenarios "an immediate appeal from

the order may materially advance the ultimate termination of the litigation" fulfilling the purpose of the 28 U.S.C. § 1292(b).

### (F) Attached orders relevant to the petition

1. Order granting in part and denying in part Defendants' Motion for Summary Judgment;

2. Transcript of Hearing on Summary Judgment;

3. Order for Interlocutory Appeal

### (G) Conclusion

For the reasons stated herein, Plaintiff requests the court issue an order certifying the ruling dismissing Plaintiff's claims under §1983 and state law for interlocutory review. Counsel has consulted with Defense counsel pursuant to local rules and defense counsel objects to the motion. Plaintiff counsel further certifies that a memorandum of law is unnecessary as all relevant facts and legal authority are contained herein.

Respectfully submitted this the 20th day of October 2014 in Columbia, South Carolina.

s/J. Christopher Mills
J. Christopher Mills
Fed. ID No.: 4802
PO Box 8475
Columbia, South Carolina 29202
Telephone: 803-748-9533
Facsimile: 803-753-9123
chris@chrismillslaw.com

18

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on October 20, 2014, I hand filed the foregoing with the

Clerk of Court, with opposing counsel being served via U.S. Mail.

Andrew Lindemann, Esquire
Steve Spreeuwers, Esquire
Davidson & Lindemann, P.A.
Post Office Box 8568
Columbia, South Carolina 29202-8568
alindemann@dml-law.com
sspreeuwers@dml-law.com
803-806-8222

*Counsel for Defendants*

The necessary filing and service were performed in accordance with the

instructions given to me by counsel in this case.

/s/  Karen R. Taylor
Karen R. Taylor
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street
Suite 230
Richmond, VA  23219

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Steve Randall Smith, | ) | C/A: 0:11-2395-JFA |
| | ) | |
| Plaintiff | ) | ORDER |
| | ) | GRANTING IN PART |
| v. | ) | AND DENYING IN PART |
| | ) | DEFENDANTS' MOTION |
| Major N.C. Murphy; Captain Charles Grant; | ) | FOR SUMMARY JUDGMENT |
| DeputyT.J. Murphy; and Alex Underwood, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Plaintiff, Steve Randall Smith, was arrested for assault and battery on September 12,

2009 at the I-77 Speedway in Chester, South Carolina. In 2011, plaintiff initiated this action

pursuant to 42 U.S.C. § 1983, alleging that he was subjected to false arrest without probable

cause and constitutionally excessive force during the course of his arrest. He also asserted

related state law claims against defendant Alex Underwood, Sheriff of Chester County.

After discovery was concluded, the parties prevailed upon the court to stay this action so that

the underlying state court criminal charges could be resolved. Finally, in August 2013, the

plaintiff's state charges were dismissed.

Defendants have now moved for summary judgment on all of plaintiff's claims. For

the reasons which follow, the court will grant summary judgment as to the defendants on the

Fourth Amendment false arrest claim and the state law false arrest claim against Sheriff

Underwood. The court will deny summary judgment as to the Fourth Amendment excessive

1

**ATTACHMENT 1**

force claim and state law battery claim.

## BACKGROUND

On the night of September 12, 2009, plaintiff was participating in the annual Shrine race at the I-77 Speedway, a dirt track raceway in Chester, South Carolina. According to the owner of the track, the Shrine Race is one of the bigger races held, with approximately 4,000 people in attendance. The gates open at 4:00 p.m. and the Shrine Race usually lasts until as late as one or two o'clock in the morning. Track policy permits spectators and crew members to bring an unlimited quantity of alcohol, as long as they do not bring liquor or glass-bottled beer. Traditionally during races, the Chester County Sheriff's Office has assigned police officers to the race track to provide security.

On the night in question, there were to be six or seven vehicle divisions for the main race and two qualifying races for each division. The prize money for the winner of plaintiff's division was $3,000. Defendants suggest that this prize for the Shrine Races is in the top percentage of dirt tracks in the relevant racing circuit.

Plaintiff and Chad Paxton were both participants in the Late Model division. During the qualifying race for their division (which determines positioning for the main race), plaintiff and Paxton were side-by-side leading the pack. When the two came out of a turn, Paxton used the front left fender of his car to push the right rear quarter panel of plaintiff's car. This caused plaintiff's car to spin and turn headfirst into the wall, which he struck. Although two wheels of plaintiff's car left the ground, the car did not flip. Because of the

damage to his car, plaintiff was unable to complete the qualifying race, thus placing him in a disadvantageous position for the main race in the event he was able to repair his car in time.

Significant for purposes of this case, plaintiff eventually pulled his damaged car into the pit area in the infield track, and began walking toward the scale area to confront Paxton. The events that occurred from this point forward are sharply disputed by the parties. Plaintiff essentially contends that the defendants—who were all uniformed law enforcement officers providing security for the race—dragged him down from behind and began beating him for no apparent reason. Plaintiff has secured the affidavits of numerous patrons who attended the race which are said to verify the plaintiff's version of events.

Defendants present a sharply contradictory series of events. They contend that around the time that plaintiff was walking directly toward Paxton's car, a track employee informed Deputy T.J. Murphy that plaintiff was "probably going to come up here (to the scale area) and cause a problem."[1] Deputy T.J. Murphy notified his father, Major N.C. Murphy, and at least one of the officers relayed the same information to defendant Charles Grant, a third law enforcement officer on the scene.[2] Upon receipt of this information and observing plaintiff walking towards Paxton, Deputy T.J. Murphy, in full police uniform, walked up to the

---

[1] The scale area is a part of the infield, where the cars are weighed.

[2] This racetrack employee was later identified as one "Charles Johnson." Plaintiff makes much of the fact that there was no racetrack employee by that name and suggests that Murphy has fabricated his encounter with Johnson in an effort to justify the arrest and scuffle that ensued. It appears to be undisputed, however, that Deputy T.J. Murphy notified the other officers that a racetrack employee had warned him of ensuing violence, and these officers reasonably acted upon information provided by their colleague. It is well settled that a law enforcement officer's *perceptions* of the objective facts of the incidents in question are relevant to the qualified immunity inquiry. *Roland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994).

3

plaintiff and told him that "they did not need any problems" and told the plaintiff to return to his pit area. Despite this command, plaintiff allegedly walked around Deputy T.J. Murphy and continued his approach toward Paxton's car. Murphy attempted to grab the plaintiff to prevent him from approaching Paxton's car, but plaintiff shrugged away from Deputy T.J. Murphy's grasp. According to the officers, plaintiff approached Paxton's window and appeared to grab Paxton's helmet and shake it. T.J. Murphy also thought that plaintiff looked as though he were about to strike Paxton. Murphy thereupon grabbed plaintiff from behind and pulled him away from Paxton's car. Murphy and Paxton then fell to the ground and as Murphy tried to get up and get a better position, plaintiff grabbed hold of both of Deputy T.J. Murphy's legs. At some point during the scuffle, Major Murphy and Captain Grant arrived and tried to help control and handcuff plaintiff. According to the officers, plaintiff actively resisted their attempts to cuff him, and kept trying to get up.

Eventually, plaintiff was handcuffed and cited for assault and battery and taken to the Chester County Detention Center ("CCDC"). As noted previously, the state criminal charges against the plaintiff were eventually dismissed. Following his release from CCDC, plaintiff was seen by a physician, who diagnosed plaintiff with a right elbow contusion and contusion on the ribs. Plaintiff contends that he additionally suffered two black eyes, abrasions, and "dismissed use of his right arm from hyper-extension of his elbow."

Plaintiff's complaint alleges Fourth Amendment violations under 42 U.S.C. § 1983 against deputies Charles Grant, N.C. Murphy, and T.J. Murphy, in their individual

4

capacities.[3]   Plaintiff also asserts analogous state law claims for false arrest and battery against Sheriff Alex Underwood in his official capacity.  The state law claims are brought pursuant to the South Carolina Tort Claims Act which expressly provides that the Sheriff is the proper defendant as to the state law claims.

On this record, the court determines that the defendants are all entitled to summary judgment on the federal and state false arrest claims, but not the federal excessive force and state battery claim.

STANDARDS OF LAW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute of material fact is "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party.  *Anderson*, 477 U.S. at 248–49.

---

[3] According to the defendants, the plaintiff has misidentified the father-son team that was included in the security detail.  Defendants assert that the person referred to in the caption as "N.C. Murphy" is Major William Murphy and that the person referred to as "T.J. Murphy" is actually Torrey Murphy.  Inasmuch as no effort has been made by the plaintiff to amend the complaint to conform to facts uncovered during discovery, the court will deal with the parties as alleged in the complaint.

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets that burden and a properly supported motion is before the court, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 323. All inferences must be viewed in a light most favorable to the non-moving party, but he "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

The doctrine of qualified immunity protects governmental officials performing discretionary functions from liability for civil damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982). When an official properly asserts the defense of qualified immunity, the official is entitled to summary judgment if either: (1) the facts, taken in the light most favorable to the plaintiff, do not present the elements necessary to state a violation of a constitutional right; or (2) the right was not clearly established, such that it would not have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Pearson v. Callahan*, 555 U.S. 223, 231–32, 129 S.Ct. 808 (2009). As explained by the Fourth Circuit in *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir.1992), "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."

6

CLAIMS UNDER 42 U.S.C. § 1983

*The False Arrest Claim*

It is well settled that when analyzing § 1983 claims, the court is required to view the scene as perceived by the officers at the time, and not with the benefit of 20/20 hindsight. As indicated in the factual recitation above, the law enforcement officers assigned to provide security on the night of the race were faced with a potentially volatile situation. They were in charge of maintaining order for a crowd of approximately 4,000 people and it was reasonable for the officers to assume that some of the spectators had probably imbibed in alcohol on a Saturday night at a dirt racetrack. They saw one driver's car pushed to the wall, thereby causing significant damage, a not uncommon occurrence on dirt tracks where traction is poor and visibility is impaired due to dust. At least one representative of the racetrack had informed the officers that trouble was afoot.

On this record, the court determines that the law enforcement officers had probable cause to arrest the plaintiff for assault and battery. While the precise events following the collision on the track are sharply in dispute, it can be argued that plaintiff, by his own admission, was extremely upset after the accident and was quite obviously headed directly toward Paxton's car in an effort to voice his displeasure. Whether he was partially inside of Paxton's car as the officers contend, or merely outside of the car making menacing gestures, the officers had probable cause to arrest him for at least an assault. For this reason, the court will grant summary judgment to the defendants on the § 1983 false arrest claim.

7

Even if the officers did not have probable cause for an arrest, they are immune from suit under the facts alleged here because of qualified immunity. The court cannot say that the law enforcement officers violated the clearly established federal law in deciding to arrest the plaintiff for assault and battery.

*The Excessive Force Claim*

According to plaintiff's version of the events, even after he was subdued by the four officers participating in the arrest, the officers continued to pummel the plaintiff with their fists and shout obscenities towards him. The law is clearly established that an arrestee, after being clearly subdued and handcuffed, should not be subjected to continued blows by the fist. This being the case, the court cannot say that the defendants enjoy qualified immunity as to the excessive force claim.

One other issue of the excessive force claim bears mention. At the time of the events in question here (September 12, 2009), it was the law of the Fourth Circuit that, in a § 1983 case, if the plaintiff's injuries were said to be "de minimis," then the claim failed as a matter of law. *Norman v. Taylor*, 25 F.3d 1259, 1263 (4th Cir. 1994). Five months later, the United States Supreme Court, in *Wilkins v. Gaddy*, 559 U.S. 34 (2010), rejected the Fourth Circuit's de minimis rule and held that even plaintiffs in § 1983 actions who receive only de minimis injuries could still maintain an action for excessive force. The defendants argued that *at the time of the arrest and ensuing scuffle*, the established law in the Fourth Circuit was that an arrestee who maintained only de minimis injuries could not survive summary judgment in

8

a § 1983 excessive force claim. And, because this court is required to view the law as it existed at the time of the event, this case must be decided upon pre-*Wilkins* law that prevailed in the Fourth Circuit at the time. *Hill v. Crumb*, 727 F.3d 312 (4th Cir. 2013) (holding that, in considering a defense of qualified immunity, *Wilkins* (and the abrogation of the de minimis injury standard) does not apply retroactively to allegedly tortuous conduct that occurred prior to that decision.) *Id.* at 322.

Defendants contend that the plaintiff's injuries are "classic de minimis injuries." The court disagrees. Viewed in the light most favorable to the plaintiff, as the court must view them at this juncture, the facts indicate that plaintiff's injuries, particularly regarding his elbow dysfunction, constitute more than de minimis injury so as to survive summary judgment.

### THE STATE LAW CLAIMS

Plaintiff has asserted state law claims against the Sheriff in his official capacity, for the actions of his deputies allegedly committing a battery and false arrest on the night in question. Inasmuch as the court has determined that the officers did, in fact, have probable cause for the arrest of the plaintiff, the state false arrest claim must fail. The state law battery claim, which is roughly parallel to the federal excessive force claim, shall survive summary judgment.

9

For all the foregoing reasons, the defendants' motion for summary judgment (ECF No. 72) is granted in part and denied in part as set out herein.

IT IS SO ORDERED.

August 29, 2014
Columbia, South Carolina

Joseph F. Anderson, Jr.
United States District Judge

1

1  UNITED STATES DISTRICT COURT
   DISTRICT OF SOUTH CAROLINA
2  ROCK HILL DIVISION

3  ------------------------------

4  STEVE RANDALL SMITH,                     CV NO.: 0:11-2395
                                            Columbia, SC
5           Plaintiff                       August 12, 2014

6      -against-

7  MAJOR N.C. MURPHY, CAPTAIN
   CHARLES GRANT, DEPUTY T.J.
8  MURPHY, and ALEX UNDERWOOD,

9           Defendants

10 ------------------------------

11

12        BEFORE HON. JOSEPH F. ANDERSON, JR.
           UNITES STATES DISTRICT COURT JUDGE
                  MOTION HEARING
13

14 APPEARANCES:

15

16 FOR PLAINTIFF:      J. CHRISTOPHER MILLS LAW OFFICE
                       BY:  J. CHRISTOPHER MILLS, ESQ.
17                     P.O Box 8475
                       Columbia, SC  29202

18 FOR DEFENDANTS:     DAVIDSON & LINDEMANN, P.A.
                       BY:  ROBERT D. GARFIELD, ESQ.
19                          STEVEN R. SPREEUWERS, ESQ.
                       1611 Devonshire Drive
20                     P.O. Box 8568
                       Columbia, SC  29202

21

22 COURT REPORTER:     DANIEL E. MAYO, RDR
                       Certified Realtime Reporter
23                     901 Richland Street
                       Columbia, SC  29201

24

25        STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

**ATTACHMENT 2**

2

```
1          THE COURT:  We're here in the case of Smith versus
2    Murphy.  It's been fully briefed.  I read the briefs, I am
3    prepared to hear from counsel.  Who's going to speak for
4    defendants?
5          MR. GARFIELD:  Robert Garfield for the defendants,
6    your Honor.  May it please the court.  Ever since your Honor
7    has stated that you have read the briefs I think we can all
8    agree that the facts, at least as presented in the briefs on
9    both sides, are fairly comprehensive.
10         THE COURT:  Well, the facts about what happened on
11   the track are not much in dispute.  There does appear to be
12   some dispute among some of the spectators as to exactly what
13   happened when the plaintiff approached the car.
14         MR. GARFIELD:  Yes, your Honor.  If I may, your
15   Honor, I think I've carved out at least a brief recitation of
16   the facts --
17         THE COURT:  Go ahead.
18         MR. GARFIELD:  -- that may be material for purposes
19   of the dispositive motion.  As your Honor is aware, this
20   occurred on the night of September 12, 2009.  This is known as
21   the annual Shrine race at the I-77 Speedway in Chester, South
22   Carolina.
23         Going to the race itself, taking the facts in the
24   light most favorably to the plaintiff, we understand that the
25   plaintiff and Mr. Chad Paxton were both competing in this race
```

3

1  and they got nearly to the end in which they were side by

2  side, at which point Mr. Paxton apparently made some maneuver

3  which pushed plaintiff's car into the wall.  And this caused a

4  severe amount of damage to the plaintiff's car.  He actually

5  turned head first into the wall, struck the wall about 60, 70

6  miles an hour.

7          The key points here, your Honor, in our estimation,

8  are a few things.  First of all, that the plaintiff saw Mr.

9  Paxton's maneuver, he saw it as intentional.  I believe he

10  testified that this -- believed this is one of the worst

11  things one driver could do to another driver.  And when he

12  pulled his damaged car back to the pit in the infield area he

13  immediately proceeded towards the scale area to confront Mr.

14  Paxton.

15          THE COURT:  I think it really strains credulity he

16  was going to see Mr. Paxton to give him a high five and say

17  good race, brother.  He was going to a confrontation.  You

18  know, the timing is unusual.  We had the tragedy that occurred

19  this weekend at the sprint track.  Of course, that is not

20  going to play any part in what I do in this case, but I will

21  say that one news statement I watched showed another driver

22  who had been pushed into the wall, I'm not sure the same one

23  that was killed, but he felt like he had been pushed into the

24  wall and he took his helmet and wound up like a baseball

25  pitcher and threw it at the windshield of the car.  And the

4

1    news report said this happens a lot, the racing fans love it.

2    So I'm not going to base anything I do in this case on that,

3    but I think I can assume that the plaintiff was going to see

4    Mr. Paxton to at least give him a piece of his mind.

5              MR. GARFIELD:  Correct.  And to add to that, your

6    Honor, at least to build on maybe common knowledge with

7    respect to that, is what the officers also knew when they were

8    assigned to these particular events, which we allege is very

9    key and important here.  And for this background it is very

10   usual that there are -- there's frequent hostility and a lot

11   of intensity not only among the drivers but, as we understand

12   it, the crew, as well.  For a couple of reasons.

13             Number one, there's considerable prize money at

14   stake.  I believe for this particular race, this division or

15   qualifying race that the plaintiff was competing in, the

16   winner would take upwards of $3,000.  Also, this race, which

17   may be unlike a more organized race that your Honor is

18   referring to, this speedway is a dirt racetrack with limited

19   traction in which wrecks are common.  And since drivers spend

20   a lot of personal money on their car we have testimony that

21   the fights and the arguments generally ensue.  And for these

22   reasons the Chester County Sheriff recognized this and he

23   arranged for deputies to patrol this particular event.  And

24   that's why we --

25             THE COURT:  You mean the Shriners race or all races?

5

1        MR. GARFIELD:  The Shriners race in particular.  Now,

2   Mr. Mills may add something on that, but this race, these

3   officers knew about this, knew about the propensity to

4   violence and that sort of thing.  But immediately following

5   this collision the plaintiff proceeded to the scale area where

6   the drivers were pulling on after the race.  There's evidence

7   that he was visibly angry, that as we say down here, he was

8   hot, his adrenaline was going, he was seen walking towards the

9   scale area in an aggressive manner and beelining to Mr.

10  Paxton's car.  He approached the window.

11       That moment, your Honor, whether there is three or

12  four or five people that saw things differently, I think even

13  in the light most favorably to the plaintiff he's beelining

14  going toward the driver.

15       THE COURT:  But what is in dispute?  Your officers

16  say he brushed aside an officer who was trying to slow him

17  down.

18       MR. GARFIELD:  Yes, your Honor.

19       THE COURT:  They have spectators who say that the

20  officer just ran him down blind and dragged him down.

21       MR. GARFIELD:  Yes, your Honor.

22       THE COURT:  I mean, I'm not choosing up sides, but

23  that's a disputed fact, isn't it?

24       MR. GARFIELD:  Well, not necessarily, and here's why.

25  The first set of witnesses that your Honor is referring to,

6

```
 1    that is a disputed fact but that's not a material disputed
 2    fact.  Because even if our officers got up and testified that
 3    the use of force continuum, they had to go to each prong.
 4         For instance, officer presence.  According to the
 5    officers that didn't work.  Verbal direction, that didn't
 6    work, and that's why they had to use soft empty hand control.
 7    That does not play a part into probable cause as to whether
 8    the plaintiff actually had some encounter inside the car.
 9    Even the plaintiff alleges that he did go to the car itself.
10    From the perspective of the officers when he approached there,
11    one of the officers says that he was waist deep into the car
12    and there was some encounter, there was some furtive or
13    physical movement inside the car.  Whatever happened --
14         THE COURT:  I've seen these cars.  If I'm not
15    mistaken, they have a big old -- the seat comes way up and
16    almost wraps around the driver's head.  Isn't that right?
17         MR. GARFIELD:  I don't know if we have a description
18    of this, and Mr. Mills may touch on that on behalf of his
19    client, but from what our officers stated was all three or
20    four officers had a different view, their respective views
21    were either obstructed by the distance or from the fact that
22    people were in the way or there was so much commotion.  But,
23    regardless, there was something that happened inside that car.
24         After whatever happened Deputy Murphy, he had to get
25    the plaintiff away from Mr. Paxton and so he grabbed him and
```

7

1   pulled him down and went to the ground.

2           But before I go to that for a moment, as far as

3   probable cause, we believe, number one, for your Honor to look

4   at whether probable cause existed for them to even apprehend

5   him and seize him that would trigger a Fourth Amendment

6   consideration.  The second part of that is whether the force

7   was reasonable.  But --

8           THE COURT:  It doesn't take much to commit a battery.

9           MR. GARFIELD:  Well, your Honor --

10          THE COURT:  A lot of batteries occur and are never

11  arrested or charged.  But a battery can be a fairly

12  insignificant attempt to -- apparent attempt to inflict injury

13  on someone.

14          MR. GARFIELD:  Exactly, your Honor.  And from the

15  way -- there is so much minutiae of detail and perspective

16  here.  But what we believe, your Honor, and I believe we

17  briefed this on page nine and ten of our brief, we address the

18  Wilson versus Kittoe case, that's K-I-T-T-O-E, Fourth Circuit

19  from 2003, in which your Honor is well aware the standard

20  that -- I think the basic sound bites are that the officer has

21  probable cause for arrest when the facts and circumstances

22  within the officer's knowledge are sufficient to warrant a

23  prudent person, and so forth, but they continue to say in the

24  circumstances shown.

25          Now, your Honor, we have already in our brief

8

1    prepared a laundry list of sorts, and pages ten and 11 that

2    for the sake of brevity I'm not going to go over that, but the

3    key point here is what your Honor has already alluded to as

4    far as it does not take much for an assault and battery.  For

5    a battery there needs to be, as your Honor is aware, a violent

6    physical contact.

7         THE COURT:  Assault and battery?

8         MR. GARFIELD:  But the assault and battery would --

9         THE COURT:  He was arrested for assault and battery.

10        MR. GARFIELD:  Assault and battery.  So the -- we

11   contend that the officers would have to have probable cause to

12   believe that there would have been a harmful apprehension of

13   some sort of unnecessary, unwanted touching and a violent act

14   itself.

15        What the officers stated was, one officer said from

16   his point of view the plaintiff was waist deep in the car.

17   The second officer saw from his point of view it appears that

18   he had actually struck Mr. Paxton.  And then the third one

19   said well, it kind of looked like he was in the car but he was

20   either grabbing or shaking his helmet.  The key question is

21   not as to whether he was guilty of actually making contact

22   with him.  And we would also submit that the plaintiff, with

23   all due respect, doesn't really contest the quickly evolving

24   set of circumstances which lead him there, he just takes the

25   position I didn't touch him.

1          Well, that goes to his guilt and these cases are very

2    clear we're not talking about guilt.  Did the officers, it's

3    not a subjective belief, but it was it objectively, was it

4    objectively reasonable based on the circumstances confronting

5    them as to whether there was some type of an unwanted touching

6    and a harmful apprehension of the touching.  And we believe

7    that this appearance alone, appearance of willful conduct on

8    the part of the plaintiff, is sufficient to establish probable

9    cause for assault and battery.

10          Once again, we also address the Michigan versus the

11   Fillipone case from 1979 in which the Supreme Court states

12   it's important to note that the validity of the arrest does

13   not depend on whether the suspect actually committed the

14   crime.  So the completion of a battery or the occurrence of an

15   assault is not relevant.  What is relevant is to what the

16   deputies' impressions, what they considered at the time in

17   view of all the surrounding circumstances.  And we believe

18   that they had -- we assert they had reasonable grounds for the

19   belief of guilt.

20          I could go into the force aspect of this, your Honor,

21   if you want me to at this time.  But the probable cause --

22          THE COURT:  So he says that he thought he was being

23   pulled down by some of the crew members of Paxton, right?

24          MR. GARFIELD:  Yes, sir.

25          THE COURT:  Were the officers uniformed?

1         MR. GARFIELD:  Yes, your Honor.

2         THE COURT:  And was -- did they testify that they

3    announced themselves as officers when they apprehended him in

4    the car?

5         MR. GARFIELD:  I believe --

6         THE COURT:  I don't remember reading anything about

7    that.

8         MR. GARFIELD:  I believe he takes the position that

9    no one did identify themselves, and I want to be fair to his

10   part.  But the key part of what your Honor is referring to is

11   not so much as to the nature of the officers identifying

12   themselves, but he takes the position that he felt like

13   somebody was on top of him so he was trying to get out of

14   whatever kind of situation he was in.  Which from the

15   officers' point of view he's resisting lawful authority.  So

16   if they have probable cause for the arrest, certainly, as your

17   Honor is aware, they would be able to use some force necessary

18   reasonable to effectuate the arrest.  So that goes to what the

19   officers are stating is that he was resisting arrest.

20        The force issue itself, your Honor, assessing the

21   appropriateness of force, and I admit I came into this case

22   late, in fact, I didn't really start looking at the facts

23   until a few months ago, but it took me a while to sort of

24   condense down what we're talking about.

25        And it looked like there are two instances of force.

1   One would concern the force used in taking the plaintiff to
2   the ground to which I just referred.  And the second is the
3   force used while he was on the ground.  But I think they are
4   really to some extent two different analyses.  And here's why.

5        The force used in taking the plaintiff to the ground,
6   it's important to note that that was after the purported
7   assault and battery.  So that the plaintiff was grabbed from
8   behind, allegedly, and taken to the ground.  And just as I've
9   stated, your Honor, under Graham versus Connor, the right to
10  make an arrest has a right to actually use some force.  If
11  that's true, your Honor, and there was probable cause that
12  existed, then this entire case for the court's consideration
13  is the issue would then boil down to under Graham versus
14  Connor, and I believe the part of the holding from page 397,
15  that concerns the force used while the deputy and the
16  plaintiff was on the ground was whether the amount of force
17  used was objectively reasonable under the circumstances.

18       It occurred to me that I have tried at least three
19  recent excessive force cases before your Honor in the last
20  several years and each one centered on really the same issue
21  in which I called a snapshot analysis.  In which your Honor
22  has charged the jury to say that the relevant evaluation here
23  is at the exact moment, is at the precise moment force was
24  used.  So if you are taking a snapshot then I will ask the
25  court or submit to the court that the appropriate query here

1   is whether the amount of force was used was objectively

2   reasonable at the time that they were on the ground.

3            Now, the courts in deciding the sufficiency of the

4   force, they allow some other factors to be considered.  For

5   instance, at the moment that the officers believed that the

6   plaintiff was resisting arrest they all testified that they

7   maintained a genuine concern about the crowd, that this was a

8   very unique situation, that they had a genuine concern about

9   the crowd could escalate the situation.  And this has been

10  articulated and well preserved in the record.

11           THE COURT:  Let me ask you, there was a policy that

12  you could bring alcohol if it was not in bottles.

13           MR. GARFIELD:  Yes, sir, not in bottles and no

14  liquor.  But you could -- it's unlimited quantities of

15  alcohol.  You've got these RVs and cars coming in --

16           THE COURT:  Was there a policy on weapons?

17           MR. GARFIELD:  I can't speak to that.

18           THE COURT:  It's not in the record either way, no

19  evidence of that either way.

20           MR. GARFIELD:  But there was no metal detector.  This

21  wasn't like you're going into a college sporting event, that

22  kind of thing.  You had cars and people and RVs on the inside

23  and they really could have had anything.  This was a large

24  event, up to 4,000 people, 2,000 on the infield, roughly 2,000

25  in the stands.  The gates are open at 4:00 o'clock in the

1   afternoon.  And as your Honor has just alluded to, it could be

2   six to eight hours of heavy drinking.

3        Weapons are questionable, I can't imagine that they

4   would be allowed.  But weapons, you know, I hope this comes

5   out right, I married a Chester County girl, but in Chester

6   County on Saturday night weapons could be a gun or knife and

7   it could be a tire iron.  With all due respect, the track

8   permits unlimited quantities of alcohol but I think there's

9   also testimony, and again this is not meant to offend, but the

10  particular nature of this, someone said that Shriners are

11  known to drink more alcohol than the typical crowd.  The

12  sheriff was a Shriner, he took -- he recognized this and

13  that's why he wanted to have law enforcement officers there.

14       From those standpoints there's testimony is that the

15  crowd appeared very hostile, they were loud, possibility of

16  weapons, and these four defendant deputies were assigned to

17  this event for those -- that purpose.

18       There is an added measure here, your Honor, about the

19  crowd in that I believe there was testimony that the crowd

20  itself creates its own additional problems.  Such as while the

21  law enforcement presence may be an effective deterrent to a

22  certain point, it could actually create additional concern to

23  the deputies.

24       THE COURT:  One of the officers said he tried to get

25  over there and the crowd was so thick he couldn't get there.

14

1          MR. GARFIELD:  That's exactly right.  They were fully

2     uniformed officers, it's relatively dark, they are outnumbered

3     three or four to 4,000 heavily intoxicated, I'm not saying

4     everyone, but potentially --

5          THE COURT:  The plaintiff keeps on jumping up every

6     time you say heavily intoxicated.  I can't presume that.

7          MR. GARFIELD:  Okay.  Then let's just say, your

8     Honor --

9          THE COURT:  I think I have to assume some drinking is

10    going on and the officers probably knew that.

11         MR. GARFIELD:  To make the record clear, I will be

12    clear, so if I over-generalized I apologize.  The policy

13    itself is not limit the amount of alcohol.  The fact that

14    alcohol is permitted, unlimited quantities --

15         THE COURT:  In the concession stand, you can bring

16    your own.

17         MR. GARFIELD:  Yes, your Honor, they can bring your

18    own.  And we're talking six to eight hours of drinking.

19    You've got four law enforcement officers in this particular

20    region that may or may not be patrolling for alcohol, they are

21    looking at maybe more nefarious kinds of allegations or things

22    in the crowd.

23         But be that as it may, the law enforcement officers

24    believed that not only you've got this combustible situation

25    but the plaintiff himself, they believe that his own actions

1    were increasing a potential threat.  He's actively resisting

2    arrest.  Even if the plaintiff did not believe that he was

3    resisting arrest, to the officers you have an individual

4    that's keeping his hands underneath his body making it

5    impossible for the deputies to determine as to whether he had

6    a weapon.

7        Now, we're all in here and I got to meet Mr. Smith,

8    he seems like a fine gentleman, but at this particular time

9    the court -- the law does not require the court to look at

10   things or permit the court to look at things in hindsight.

11   These officers didn't know who he was, and that was the

12   concern at the time.  So we believe that as far as the force

13   itself while he was on the ground and we had a physical

14   struggle, again, as a snapshot analysis the plaintiff who was

15   on all fours and maybe he was defending himself, but he

16   grabbed ahold of the deputy's legs, the deputy tried to free

17   his legs and try to subdue and handcuff him.

18       You do have a large crowd, as your Honor mentioned,

19   it was gathering, the deputies believed that they were getting

20   out of control and it was escalating quickly in their mind and

21   they believed there was a dangerous situation to not only the

22   other patrons but to themselves.

23       There are other aspects of this as far as an in

24   addition to the opposing an angry crowd, at least two other

25   people attempted to interfere with the plaintiff's arrest.

1   Again, they may have had had a good faith basis, but as far as

2   the officers are concerned there was some interference.  And

3   then one officer, I believe he stated that he had to divide

4   his attention between the plaintiff and his service weapon

5   because of the concern that somebody from the crowd may have

6   grabbed ahold of it.

7         I think importantly, your Honor, when looking at this

8   good faith basis, the plaintiff does admit in this case that

9   the force used against him did cease as soon as he was

10  handcuffed.  In other words, we would take the position that

11  the deputies used no force, no force, no -- excuse me, no more

12  force than was necessary to accomplish the handcuffing.

13        And in our -- page 15 of our brief we cite Wilson

14  versus Flynn, it's a 2005 Fourth Circuit case in which the

15  court recognized, quote, We also find it significant that

16  Wilson admits that the allegedly excessive force ceased after

17  the officers handcuffed him.

18        It's for those reasons, before I would even get into

19  a qualified immunity analysis which I would like to be heard

20  at the appropriate time, that we believe that there is no

21  Fourth Amendment deprivation as a matter of law for both the

22  arrest, the justification --

23        THE COURT:  Let me say if the facts occurred as your

24  officers testified I would have no hesitation ruling that you

25  win on the substantive question of whether there was a

17

1   violation, and also at the very least qualified immunity would

2   apply.  The problem I have is they got these third-party

3   witnesses who were spectators who give a sharply contrasting

4   version of what happened.  I'm not saying I believe them, but

5   they say that the officers just ran the plaintiff down from

6   behind, hit him on the head, I think, and drug him to the

7   ground.

8            MR. GARFIELD:  I beg the court's indulgence just one

9   moment, your Honor.

10           (There was a pause in the proceedings)

11           MR. GARFIELD:  I would agree, your Honor.  But this

12   is where I'm wrestling with the proposition.  I believe that

13   even on the facts taken most favorably to the plaintiff the

14   plaintiff did reach the car.  And there was some activity

15   just --

16           THE COURT:  Whether he saw the officer going to the

17   car or not he made a beeline for the car.

18           MR. GARFIELD:  Yes, sir.

19           THE COURT:  And I think the plaintiff's witnesses do

20   say he reached his hand out, maybe.

21           MR. GARFIELD:  And I think that's important because

22   even if you have two or three individuals saw things

23   differently I think the law is clear if you are going to take

24   the facts most favorably to the plaintiff he apparently would

25   be asking the court to overlook what he's saying and look at

1    what other people are saying.  What the officers -- and,

2    again, it's not what actually happened --

3             THE COURT:  He did say he reached his hand out or

4    made a pointing gesture, didn't he?

5             MR. GARFIELD:  Yes, your Honor, that is true.

6    Witnesses do report seeing the plaintiff shaking his hand in a

7    pointing motion towards Paxton.  Now, as your Honor can also

8    reasonably see, that when you do have this commotion and chaos

9    immediately following something like this in which the only

10   individual that knew what he was going to do would be the

11   plaintiff himself, who was visually and maybe even justifiably

12   angry, that everybody themselves were reacting to this and

13   were in different positions with different views.

14            He concedes the fact that he went up to the window.

15   These witnesses still say that there was some activity in the

16   window.  The question isn't as to whether there was actually

17   an assault and battery, once again, but from these officers'

18   perspective looking through the lens of an objectively

19   reasonable officer could they have believed there was an

20   assault and battery, and that is our point.  No matter what

21   these witnesses say, again, they still don't negate the basic

22   fact.

23            Whether the officers had any sort of interaction with

24   him to try to stop him, we believe that that is a disputed

25   fact and that could possibly be relevant in another context,

19

1  but not relevant as far as what's material for dispositive

2  purposes as to whether probable cause existed.

3          THE COURT:  Held on one second.

4          (There was a pause in the proceedings)

5          THE COURT:  My law clerk was just pointing out the

6  manager of the track testified that after the pushing to the

7  wall occurred that a radio alarm went out that -- of a caution

8  and that he admitted that the plaintiff got into the face of

9  Mr. Paxton and raised his hand.

10         MR. GARFIELD:  Yes, your Honor.  Which --

11         THE COURT:  He sort of sided with the plaintiff in

12  other respects, but he went so far as to allow that some type

13  of warning went out on the radio.

14         MR. GARFIELD:  And I did leave that out for brevity's

15  sake, but that's correct.  The deputies were following the

16  same channel as the track officials, and that is specific

17  information --

18         THE COURT:  They heard a warning go out about crowd

19  control?  Not about a warning on the track for the car but a

20  warning about crowd control?

21         MR. GARFIELD:  It was a specific concern about that

22  particular car.  It was personally notify them they identified

23  Mr. -- it was the plaintiff was identified by I believe car

24  identification, this person, that there was some sort of issue

25  going on.  It particularized the event.

1          Which is consistent, your Honor, with we do have on

2     the record that the plaintiff does admit in this lawsuit that

3     he pointed his hand and finger into the window of Mr. Paxton's

4     car by extending his arm away from his body and toward Mr.

5     Paxton in a rapid fashion.  Now, I believe we take the

6     position that no matter what happened with that, there could

7     be a hundred people with different versions of what went on

8     with respect to that, that it adheres itself to the analysis

9     of probable cause.

10          THE COURT:  All right.  Let me hear from the

11     plaintiff.  I think you covered it real well.

12          MR. GARFIELD:  And just qualified immunity at the

13     appropriate time, your Honor.

14          THE COURT:  Mr. Mills?

15          MR. MILLS:  Thank you, your Honor.  Let me start and

16     clear up this issue about what they learned about this wreck.

17     The testimony from the plaintiff's perspective is the only

18     information that came over that intercom was that there was a

19     wreck.  That's it.  Nothing further.

20          The defendants have claimed that they actually heard

21     more discussion about Mr. Smith coming over there, he looks

22     angry, that a fictional character named Charles Johnson told

23     them specific information.  Now, there is no Charles Johnson.

24     That person does not exist.  That's a make up by the officers.

25     They can't identify him, nobody's heard of him, they had no

1    way of communicating.  So talk about after-the-fact

2    opportunities, this is an after-the-fact opportunity, and you

3    will see this throughout the case, where the officers try to

4    bootstrap stuff.

5            The weapons is a great example.  Setting aside the

6    Second Amendment right to carry a weapon in South Carolina,

7    which we can debate or not, that's the law.  They want to say

8    well, we really didn't know if Randy Smith had a weapon in his

9    hand.  Now, this is a guy come off the racetrack, is walking

10   over, they're seeing his hand and claiming somehow all of a

11   sudden we're going to justify our force because we think he's

12   got a weapon.

13           They can make that argument, Judge, but they should

14   make that to a jury because that's just completely and

15   patently unreasonable.  And that's just their effort to scare,

16   throw stuff out at the judge, drunken hooligans, Shriners

17   going crazy.  Not one person have they identified as

18   intoxicated.  Not a single person have they suggested was

19   intoxicated other than just throwing it out there to just kind

20   of confuse, muddy the waters.  This could have, could have

21   happened.  You know, somebody could have had a dirty nuclear

22   bomb in there.  I don't know.  Do they have any positive

23   evidence to suggest --

24           THE COURT:  But I just -- I can't just set aside my

25   common sense.  We had drinking at college football games where

1    it's illegal to take liquor in the stadium.  So you get an

2    event on a Saturday night where it's not prohibited, some

3    drinking is going to occur.  I think officers were reasonable

4    to assume that some drinking was going on.

5          MR. MILLS:  I don't think that's unreasonable if

6    people could bring it in.  Now, the question is how much does

7    that really factor into this if none of the participants are

8    intoxicated?  Nobody's drinking and no one coming up.

9          The only thing that they say that gives them some

10   concern, I mean, again, I think Mr. Garfield said four

11   officers against 4,000.  Like somehow 4,000 people were coming

12   out of the stands after these guys.  That's just absurd.  I

13   mean, what's happened is this individual is over there and to

14   the extent there is a crowd reaction it's all based on what

15   the officers are doing, not on anything that Mr. Smith is

16   doing.  They are all saying what are you doing to that poor

17   man.  When he talks about people interfering, he's talking

18   about Mr. Smith's brother saying hey, he didn't do anything

19   and somebody else saying, hey, let him up, we'll talk it out.

20         They want to ignore -- you started out by the

21   context, and I think you make a good point, the context of

22   this race.  No, you don't decide on common sense.  But you

23   also don't get to impute stuff in there there's no evidence

24   from.  And so in this instance when they want to talk about

25   Randy Smith coming over aggressively or making a beeline, I

1  think was the court's phrase here, well, yes, one of the

2  officers in their brief said he drove into the -- into the pit

3  at a high rate of speed.  This is a car just crashed.  I mean,

4  these guys will throw anything up against the wall to support

5  what they're doing.

6       THE COURT:  I wondered about that.  The car was

7  apparently still drivable.

8       MR. MILLS:  Yeah, I mean, they are saying, one of the

9  officers who says he can't have a view somehow still saw

10  intensity of his eyes.  Again, those are arguments Mr.

11  Garfield and Mr. Spreeuwers can make to a jury.  They are

12  asking you, Judge, accept our version, weigh the evidence and

13  believe us over them, believe us about the crowd, over them.

14  Because it's reasonable for us to believe it, a reasonable

15  officer could believe it.

16       You know, the court's familiar with the recent case

17  of Hemming versus Brunell, which is pulling up the taser when

18  they thought it was a gun.  Well, they stipulated in that case

19  he honestly believed it.  This was his perception of what he

20  was doing.  But the court also said it was unreasonable.  And

21  what they want to say about this issue at the car, and as the

22  court correctly points out, Mr. Paxton is -- the little window

23  is about this big, the car is this big, and Mr. Garfield

24  actually --

25       THE COURT:  I have seen, you couldn't get halfway in

24

1  there with a driver in the driver's seat.

2          MR. MILLS:  Of course, they said he's over the hood

3  and he's reaching in to grab and pulling the helmet and all

4  that.  That's not reasonable.  That's a disputed fact.  Now,

5  what Mr. --

6          THE COURT:  But the plaintiff was, I'm sorry, Mr.

7  Paxton was seated in the driver's seat, right?

8          MR. MILLS:  Correct.  Seated in the driver's seat.

9  And, you know, there's noise, he's got earplugs in, he's got a

10  helmet on that goes around his whole head, he has the chair

11  that straps him in.

12          THE COURT:  Am I not right they wear a helmet and

13  you've got kind of plastic ears that come halfway around --

14          MR. MILLS:  We discuss it in there.  We put it in our

15  memo.  That's why Paxton says I wasn't scared of anything.  I

16  agree his perception isn't controlling, although it is some

17  evidence of what people perceived.  So what Mr. Garfield is

18  saying, the fact I'm going to start doing this, boom, I

19  committed an assault.  This is an assault that I should get

20  arrested for right like this.

21          THE COURT:  Well, it's more than that --

22          MR. MILLS:  I mean, how else do you shake a finger at

23  somebody?  You know, you don't do it like this.  You know,

24  raise it up and you tell him something, and the question is

25  are you saying in the context of a sporting event, you know.

1    And let me address the Tony Stewart thing, since I

2    knew this was coming up.  I think it was interesting, despite

3    all that what's the first thing the sheriff says?  There is no

4    evidence of criminal conduct here.  Okay.  We're talking about

5    a man being dead.  We're also talking about in the context of

6    a sporting event.

7    And the court knows I'm a soccer player, right?  Do I

8    hop up and say hey, buddy, don't do that again?  Am I subject

9    to being arrested and taken down by cops in the context of a

10    sporting event when I do that?  I mean, that's ridiculous.

11    They're racing and they're trying to take it out of context

12    and making it -- if he had gone there and started whaling on

13    him and starting punching him that's fine.  But going up there

14    and saying, hey, buddy, you know, excuse me, what the hell do

15    you think you are doing?

16    THE COURT:  Tell me, they were in the scale area when

17    this happened, right?

18    MR. MILLS:  Correct.

19    THE COURT:  Which is down on the field below the

20    grandstand.

21    MR. MILLS:  It's on the infield after the race

22    finished.  Of course, my client came out because he hobbled

23    off, the lap finished, there was qualifying.  The other --

24    THE COURT:  How long after the accident did the race

25    end?

1          MR. MILLS:  Oh, seven, eight minutes.  I'm sorry your

2    Honor.  This is Mr. Smith here.  I apologize, I really don't

3    know that fact so I just turned to him.  But there's a time

4    period when the race comes in, he walks over there and he's

5    got two crew members with him going over there.  And to think

6    that you wouldn't -- this is a recognized thing.  People go up

7    and they say you were wrong, you do -- that's how you defuse

8    it and you let it go.  Okay.

9          Now, these officers, you know, they want to say full

10   uniform but the testimony is without any warning to him, not

11   like hey, sir, step back, I don't know what you are doing

12   here.  Like you said, well, couldn't they come over here

13   because they had a concern?  Sure they could.  Would that mean

14   they could arrest him or somehow, you know, or they could just

15   take -- of course, this is simultaneously took him out from

16   behind.  I mean, you heard the testimony, you read the

17   testimony.  Didn't break stride and leveled him to the ground.

18         Now, we tried to go point by point when they say that

19   there's undisputed facts that officers relied on.  I think Mr.

20   Garfield made references to page ten and 11.  If you look at

21   page ten and 11 I think out of like every citation is the

22   defendants' version of what happened, completely ignoring

23   summary judgment, just saying because we perceive it even if

24   it didn't happen can you reasonably perceive something --

25         THE COURT:  But also the Fourth Circuit cases say

1    it's undisputed what the officers perceived, so even if it

2    didn't happen that way you've got to focus on what they

3    perceived.

4         MR. MILLS:  The question is does that mean the

5    officer is saying.  I perceive he was a terrorist, I perceived

6    a big gun in his hand, although he didn't, I honestly believed

7    that, even if it's unreasonable?  I mean, you can't just, say,

8    make it up and say it and then it becomes fact.  I mean,

9    that's what disputes of fact, that's what a jury is to

10   resolve.  I mean, they want to suggest that -- I would say to

11   a certain degree what's interesting if you remember the Scott

12   versus Harris case which had a video and the Supreme Court

13   dealt with and they could see for themselves, listen, I can

14   see for ourselves this should have been summary judgment.

15        THE COURT:  Was that the Supreme Court case where

16   they watched the video at the oral argument?

17        MR. MILLS:  Correct.  It might have been Scott versus

18   Harris.  But since Scott versus Harris came down, a lot of

19   videos have that happen.  I've got one case right now because

20   I looked at the Fourth Circuit law that says listen, the

21   video's not dispositive because the Tolan case, and I tried to

22   draw the court's attention to, said it's not just disputed

23   facts, it's disputed inferences.

24        So when I go like this to Mr. Garfield now he can

25   argue to the jury that's a prelude to punch, that I'm going to

1  take him out.  Well, I can just scold him by taking advantage

2  of the record, I think you did something wrong.  And our

3  clients -- it's like, you know, if there's an intentional foul

4  in basketball and the basketball player gets up and kicks at

5  him and the policemen come running down, take him out and send

6  him to the jail in the context a sporting event when you are

7  challenging the other person who's committed a foul against

8  you?

9        I mean it's just -- they could argue that but you've

10  got to -- they are asking the court as a matter of law to

11  weigh that evidence and perceive that.  And, again, I would

12  say that perception issue was addressed directly in Tolan,

13  because look at some of the factual history in Tolan.  One of

14  them was the manner in which the son, who was on the ground,

15  got up and said get your hands off my -- get your F'ing hands

16  off my mother.

17        Now, the police said well, we perceived that as -- we

18  perceived that as a threatening conduct.  And the Supreme

19  Court said, I know you did, you can argue that to the jury,

20  but another jury can reasonably perceive that somebody saying

21  get your hands off my mom without any threat towards you

22  because you were aggressively pursuing their mother.

23        They talked about other instances.  And I kind of --

24  it's kind of interesting because there was, although the facts

25  are different from this, in that case the gentleman was shot

1    without warning, you know, when he said that after he had been

2    mistakenly and falsely placed on the ground.

3          And so I think what the Supreme Court has been trying

4    to tell a lot of the circuit courts that, hey, these are jury

5    issues and if you can make a reasonable inference and

6    interpretation that's contrasting with the defendants they

7    don't just get to say -- you know, it's like the objective

8    analysis is what's supposed guide with us, but they're not to

9    bring in their subjective perception even when a reasonable

10   officer wouldn't perceive that.

11         And so they are trying to have their cake and eat it,

12   too.  They are trying to sterilize the environment, take it

13   out of context and suggest that if an individual in the

14   context of race confronts another person, they want to make a

15   big deal out of confronts.  He goes over there and take it up.

16   I asked my client, what were you thinking when you went over

17   there?  I was going to tell him he better tighten your

18   seatbelt, it may happen to you next time.  You can't disagree

19   with somebody without the risk of getting arrested in the

20   context of a sporting event when you don't physically touch

21   them?

22         You know, they want to say but the officer perceived

23   him do it.  Well, that's just what they're trying to throw in

24   now after the fact.  Let them argue it to the jury.  If a jury

25   wants to believe it, it's happened to me before.  I think it's

1    telling that Mr. Garfield talked about the three cases he's

2    tried in front of a jury in front of the court.  Well, there's

3    a reason we're going to the jury.

4           I would like to -- you know, I've kind of gotten off

5    track as I tend to do to deal with stuff.  I'd be happy to

6    answer the -- you know, the dispute in the Tolan case was over

7    the mother's demeanor.  There's a dispute in this case over

8    Mr. Smith's demeanor.  You know, we don't deny that he came

9    out and he walked over there.  But it's not unusual, they have

10   seen it.  These officers just jumped the gun and went crazy

11   over something that there was no basis to do.

12          And then they want to come up and justify the fact --

13   it's just kind of ironic they go to the guy, hey, he assaulted

14   you.  He didn't hit you.  They keep talking about resisting

15   arrest.  Nobody has been charged with resisting arrest.  And

16   the testimony, again, you know, he says because he spun

17   around, that's resisting.  You spin around when you don't know

18   who's taking you down when he's on the ground.

19          But what is the testimony?  I stayed on the ground, I

20   covered myself up.  What these officers were doing, one was

21   choking him, choking him, one was standing, kicking him in the

22   ribs.  One had a knee in his back pushing his face into the

23   ground.  Okay.  Well, those aren't any kind of taught

24   restraint techniques from somebody who's non-resistant, that

25   he hasn't even tried to stop and say hey, buddy, back off.

1    Those officers weren't in any threat of injury.  Nor

2    was Paxton in any threat.  Unless the court's prepared to say

3    as a matter of law that any reasonable officer would have

4    perceived that and the ability to turn and could it possibly

5    be that?  Well, it could possibly and let them argue it to a

6    jury.

7          THE COURT:  Let me ask, I should know this, but

8    assuming the plaintiff approached the Paxton car from the

9    driver's side not the passenger's side, right?

10          MR. MILLS:  Correct.  He was on the driver's side and

11    just said, hey, buddy.  And, of course, you know, all that

12    kind of stuff you are not going to be able to shout it from

13    away.  There's people there, there's no -- they are elevating

14    this into a case that not only was this huge criminal -- and I

15    think they even referred to this as an about to commit a

16    violent crime, okay?

17          Even at best we're talking a magistrate 30 day

18    offense of shaking a finger at somebody.  But they want to

19    elevate it like this was a -- if didn't intervene at this

20    point, you know, all hell was going to break loose and

21    somebody is really going to get hurt.  That just defies

22    reasonable -- what a reasonable officer would go to Paxton,

23    you know, they are just so familiar with the track and

24    running.  They know Paxton has a full helmet on, he's in his.

25    There's a little window, you know?

1    The odd thing about their argument is, Judge, don't,

2    you know, you don't have to believe us in our lies about him

3    jumping in there, grabbing him, shaking his head.  Just

4    pretend that doesn't happen.  Just take what he says and

5    that's what the law is.  But it's kind of an odd thing, they

6    are going to defend this case factually because saying he

7    grabbed somebody and all that and when they come into court to

8    you they are going well, we -- we as reasonable officers can

9    arrest somebody for wagging their finger at somebody who's

10   done something improper to them at a sporting event.  That's

11   what they're saying.  That's a basis to arrest him.

12   And not only arrest him but violently take him down,

13   punch him, kick him, beat him, and then when people plead with

14   them to stop, all we're told is, and I'm going to say it, fuck

15   you, get out of here.  You mother fucker, you're going to get

16   this, yelling at my client, you mother fucker, I don't care

17   about your arms, smashing him into the ground.  Going to the

18   plaintiff saying hey, you want to charge this?  He says, hey,

19   he didn't do anything to me.  And their response is hey, he's

20   going to jail because he hit an officer.

21   THE COURT:  Hold on one second.  Give me just one

22   second.

23   (There was a pause in the proceedings)

24   THE COURT:  I was getting an e-mail.  I have to be at

25   the bar headquarters at 4:00 o'clock.  That gives me plenty of

1    time to finish this argument.

2         MR. MILLS:  The question becomes can an officer

3    reasonably perceive something didn't happen.  In some cases

4    they can.  But I think what the court in Tolan is saying and

5    then by summary reversal in the other cases is hey, that's

6    what juries are for.  Just because you can articulate an

7    argument at summary judgment doesn't —— and they have actually

8    asked you to do that.  They have actually cited a case for you

9    to find you should believe the officers and you should, you

10   know, weigh their testimony in light of their experience.

11   Well, they are asking you to go ahead and weigh their

12   testimony.  Now Gates versus Illinois is undisputed facts

13   about probable cause.

14         I want to address the snapshot argument.  The

15   snapshot, Mr. Garfield wants to take the snapshot not where it

16   began but sometime in the middle.  And as I think I cited in

17   my brief, Alford versus Pritchard and some other cases, it is

18   at the moment but you just don't segment it in like little

19   slices, you view it context of what's happening.  Artificial

20   divisions of time do not assist the court in the analysis.

21         And so, you know, they are hiding behind an

22   objective, reasonable officer even when their actions are

23   completely unreasonable.  That's what the law is.  So if the

24   court's prepared to say that my client by walking over there

25   and pointing his finger at somebody and telling him something

34

1    is assault and battery under our law, then I guess a lot of

2    people are subject to getting arrested in this state for

3    exercising their First Amendment right.  Because if he can't

4    look at somebody and make your point with a finger, I mean, it

5    might be rude conduct, but it surely is not criminal conduct.

6        THE COURT:  They raise a de minimis injury argument,

7    saying the facts predate the Wilkins case out of the Supreme

8    Court.  What type of injuries did your client receive,

9    specifically?

10        MR. MILLS:  Contusions on his ribs, he can not

11    straighten out his right arm, he's --

12        THE COURT:  He got a permanent disability injury.

13        MR. MILLS:  Yes, he does, your Honor.  And but beyond

14    that, the case that they cite, the Ritchie case, they are

15    talking about somebody getting arrested and the cop pulling

16    the person up by their lapels before handcuffing him.  And the

17    court said no, it's got to be more than that.  Well, that's

18    what Graham versus Connor said.  Not every push, not every

19    shove, and that was in the course of a lawful arrest.  Here,

20    no arrest.  You know, is the court prepared to say the

21    constitution allows somebody to get gratuitously punched,

22    beat, and choked and because they don't have a permanent

23    disability that somehow that excuses it?  Well, it's not and

24    the constitution doesn't do that.

25        And Gaddy dealt with, you know, a pretrial context

1    and clearly defined context.  Well, all of that stuff is not

2    anything near like what he had.  The constitution doesn't give

3    you free punches at people.

4         THE COURT:  All right.  I think you've covered your

5    case.  Let me hear anything briefly in reply from the

6    defendants.

7         MR. GARFIELD:  Yes, briefly, a few points, your

8    Honor.  First of all, to carry out Mr. Mills' analogy about a

9    sporting event, if there was a situation, for instance, my

10   favorite is football, obviously his is soccer, if there was a

11   football game, high school, college or whatever level we're

12   talking about, and my example would be is if there was what's

13   perceived as a dirty tackle and the person that was tackled

14   was very angry.  And the person that committed the tackle, the

15   defensive player walked off the field, went to the sidelines,

16   went to the locker room, and they both went, and the person

17   that felt like it was a dirty tackle was angry, his adrenaline

18   was up, he marched off the field, he followed the player, he

19   went right into his personal space, and if the officer saw

20   only part of his body, in which in this particular case every

21   single witness that may have said they saw a little something

22   different, all agree that they saw him pointing in his face.

23        The question isn't so much, once again, your Honor,

24   the guilt of an assault and battery, the question isn't even

25   so much whether there was actual probable cause.  Because even

1  under a qualified immunity analysis in which we briefed, I

2  won't go into, it just has to be arguable probable cause.

3          And here's why your, Honor.  What we have plowed

4  before, and I'm not even talking about our three cases, but in

5  the past your Honor has observed that an officer can arrest

6  for uncharged conduct.  It's the conduct itself, the

7  lawfulness of the conduct in which an objectively reasonable

8  officer would believe is lawful or unlawful.  In this

9  particular case there's sufficient evidence that not only that

10  there's assault and battery, but there's sufficient evidence

11  that there was a breach of peace.  There may be evidence of a

12  public disorderly conduct.

13          THE COURT:  I had a case recently where the argument

14  from the defendant was if he committed some crime other than

15  the one we charged him with we're still okay.

16          MR. GARFIELD:  Well, Mr. Mills might not like this

17  coming up late in saying this, but under Devonpeck (ph.)

18  versus Alford and I believe Jones versus the Town Abbeville

19  and its progeny here in South Carolina, but in the U.S.

20  Supreme Court in Devonpeck versus Alford says that an arrest

21  is lawful if probable cause exists to charge for any crime,

22  not just the crime we're talking about.

23          There was a case years ago in which I believe that we

24  received summary judgment before your Honor, I believe the

25  last name was Gianda (ph.) in which the individual called up

1    and cussed out a 911 telecommunications officer in York.  They

2    charged him allegedly with the wrong thing at the prelim but

3    his conduct was unlawful and he used the Lord's name in vain

4    over the phone.  It was deemed a profanity.  So the question

5    isn't so much as to what he actually did but what an

6    objectively reasonable officer could perceive.  So that's the

7    one point I wanted to make on the Fourth Amendment.

8         Mr. Mills brings up the Second Amendment, First

9    Amendment, none of those things are pled in this case, to my

10   knowledge.  He's talking about a Fourth Amendment violation,

11   and the Fourth Circuit and Supreme Court has defined it in

12   such a way and that's how we addressed it.  We're not trying

13   to pull the wool over everyone's eyes.

14        There was one point I did want to make on the force

15   issue in which Mr. Mills describes the amount of force was so

16   egregious or excessive.  In our brief on page 12 we do cite

17   pages 396, 397 of the Graham versus Connor case.  In the

18   portion of that case, and which your Honor is very well

19   familiar with, but a very small part indicates the Supreme

20   Court held, quote, The calculus of reasonableness must embody

21   allowance for the fact that the police officers are often

22   forced to make split second judgments in circumstances that

23   are tense, uncertain, and rapidly evolving about the amount of

24   force that is necessary in a particular situation.

25        In a vacuum what Mr. Mills says, it sounds horrible

1    that someone would grab someone's throat, that someone would

2    go to knee strikes or kicking or do anything else.  But these

3    are conditions that are addressed, your Honor, in the Graham

4    versus Connor case.

5           THE COURT:  You could go back and look at my old jury

6    charge you'd see that language dozens of times.  Because I've

7    tried plenty of cases where I tell the jury every push and

8    shove, et cetera, et cetera, and split second decisions and

9    all that.  So I'm well familiar with that law.  Of course,

10   their witnesses say it was more than just a push or a shove,

11   it was snatched him to the ground, hitting from behind on the

12   head and pummeling him while he was on the ground.

13          MR. GARFIELD:  But that's exactly why we have the de

14   minimus argument, your Honor.  I think it was, with all due

15   respect, mischaracterized over this side of the table.  That

16   in the record the plaintiff was deposed and he stated the

17   physician saw him the day following the race diagnosed him

18   with contusions, that he complained to the physician or

19   medical care folks of bruising, elbow pain, swelling and

20   abrasions.  There's nothing in the record --

21          THE COURT:  Any medical testimony developed in the

22   discovery?  Any medical testimony from doctors or hospitals?

23          MR. GARFIELD:  No, your Honor.  And that's exactly

24   why we alleged that this does not rise to the level of a

25   constitutional dimension as far as injury.  I understand what

1    he's saying as far as what the witnesses can come later and

2    say what they saw.

3         But, once again, these factors should not be

4    overlooked.  Again, hot summer's night in Chester County, it

5    was a powder keg.  There was a need from the officers' point

6    of view to control the situation, a situation that was

7    exacerbated by the plaintiff's actions.  They wanted to

8    prevent, and this isn't hyperbole on our part, there was two

9    to 4,000 people, they wanted to prevent a melee that could

10   have involved people when fights are common, alcohol was

11   prevalent, the plaintiff is resisting to what he believes is

12   maybe an unlawful arrest, but he's resisting the actions of

13   the officers.

14        These events are clearly presented in the terms of

15   Graham versus Connor.  Extremely tense, unpredictable,

16   voluble, rapidly evolving.  And the fact they used muscling

17   techniques and he may have received strikes in the struggle he

18   caused, I don't believe he should be able to come in here and

19   say well, this got out of control, when his injuries are

20   limited to exactly what the Supreme Court has carved out in

21   the pre-Wilkins versus Gaddy landscape.  Which is contusions,

22   hyperextension, superficial injuries, elbow pain, bruising,

23   swelling, abrasions, that's exactly the type of injuries that

24   the court perceives as de minimis.

25        So just looking at this objectively, your Honor, we

1    believe that not only you should not -- you should not go

2    beyond the first prong of qualified immunity, but either with

3    the second prong that clearly is -- the law is not so clearly

4    established at the time that would suggest unconstitutional

5    conduct, that they would know they were committing

6    unconstitutional conduct when we're discussing the nature of

7    the injuries, as well.

8              So, thank you, your Honor, for your time.

9              THE COURT:  All right.

10             MR. MILLS:  Your Honor, if I could, I'm not going

11   to -- just this idea of 20-20 hindsight and looking back and

12   second-judging the stuff, you know, or these rapidly evolving

13   events.  These are things that were created by the officers.

14   There was no immediacy other than hey, sir, if they had a

15   concern, hey, sir you need to step back from that car.  You

16   know, none of that.  Step in between them.

17             You seen a referee ref in a NBA game, right?  So they

18   act like all of a sudden everybody was out of control.  He was

19   hitting him, he was in immediate danger, none of this stuff.

20   They are acting like, you know, the crowd went crazy and all

21   that.  To the extent there was anybody objecting was because

22   the officers were completely out of hand and it was upsetting

23   people.  My God, what are you doing?  They want use that,

24   well, geez, everybody's upset.  We can't be held -- even

25   though we did, even though we caused it.

1          Nobody was upset seeing him going over.  They weren't

2    raising hell.  They take a lot of liberties with that and they

3    want to use this idea somehow we're second guessing.  We're

4    not.  The Fourth Circuit has said a non-resistant person.  And

5    the facts taken in the light of the plaintiff is

6    non-resistant.  They were beating him.  They didn't give him

7    an offer to cooperate.  You think a man who's never even

8    gotten a traffic ticket in his life --

9          THE COURT:  I read all that your brief but, you know,

10   if you try this case that's not really admissible under the

11   bar on character evidence.

12         MR. MILLS:  Well, your Honor, all I know is he's a

13   Shriner and they paraded him into the perp walk in front of

14   400 people --

15         THE COURT:  Let me say I think I'm ready to rule.

16   Normally I would take it under advisement and do a written

17   order, but you all need to know.  Of course, we've got a jury

18   selection coming up.

19         I'm going to issue a split decision.  I'm going to

20   rule that the officers under the circumstances of this case

21   did in fact have probable cause to arrest for assault and

22   battery.  I'm going to say there's a genuine issue of material

23   fact as to whether excessive force was used in carrying out

24   the arrest.

25         Specifically, we have a situation where we are on

1    Saturday night at a sporting event where alcohol was allowed,

2    I have to assume using my common sense that some drinking was

3    going on and that was known to the officers.  You have an

4    event where one car was pushed to the wall, the victim of that

5    accident, the plaintiff here, Mr. Smith, pursues Mr. Paxton

6    who was the driver who pushed him to the wall, approached him.

7    Whether he brushed past an officer or not, I'm going to assume

8    he did not, but going directly to the driver's side of Mr.

9    Paxton's vehicle, getting in his face.

10          Under the circumstances of this case I think a

11    reasonable officer could perceive that probable cause existed

12    for an arrest for assault and battery.  As I said, it doesn't

13    take much to commit an assault and battery.  It happens all

14    the time and it's never charged or prosecuted.  It's just like

15    changing lanes on a four-lane highway is illegal without

16    giving a turn signal but people aren't charged with it unless

17    the police are following somebody that they want to stop for a

18    drug crime and they charged him with changing lanes.  The fact

19    it's not usually charged doesn't mean it's not illegal.

20          And here an assault -- first of all, a battery is an

21    offense of touching, however slight.  You don't have to punch

22    someone out to commit a battery.  And assault is an attempt or

23    apparent threat to inflict a battery, which, again, is a very

24    lightweight test.  And under the circumstances of this case,

25    even viewing the facts in the light most favorable to Mr.

1    Smith, I determine that the facts and circumstances perceived

2    by the officers at the time led them to conclude that they did

3    in fact have probable cause to arrest for an assault and

4    battery.

5            As the defendant points out, whether he was in fact

6    guilty of it is for a jury to decide.  The question the

7    officers had to determine was whether there was probable

8    cause, and here on the record before me I determine there was

9    probable cause.

10           Now, what happened from that point forward is greatly

11   in dispute in terms of the force used to effectuate the

12   arrest, and I'm going to say that because there are so many

13   factual differences among all the witnesses on the scene that

14   summary judgment is inappropriate and dismissal on qualified

15   immunity is also not appropriate.  I can't go to qualified

16   immunity because the facts are greatly in dispute and that's

17   the reason I'm denying summary judgment on qualified immunity.

18           So we have given you all a trial date.  Jury

19   selection is the 3rd of September, I believe.  And we had some

20   confusion, some problems with lawyers being unavailable, but I

21   think we finally settled on the 4th, starting the trial on the

22   4th?  10th.  The 10th, is that correct?

23           MR. MILLS:  I believe so, your Honor.

24           MR. GARFIELD:  Yes, your Honor.

25           MR. MILLS:  Jury selection on the 4th, trial on the

44

1    10th.

2            THE COURT:  Jury selection on the 3rd.  Jury

3    selection on the 3rd, trial beginning on the 10th.  And how

4    long will the trial take?

5            MR. MILLS:  A day or two with the excessive force

6    issue.  I'm not really sure, I have to think about it.

7            THE COURT:  I don't think the evidence is going to be

8    that much different.

9            MR. GARFIELD:  That's correct, your Honor.

10    Day-and-a-half, maybe two days.

11            THE COURT:  Total?

12            MR. GARFIELD:  Excluding jury selection, of course,

13    yes.

14            MR. MILLS:  Three days at the absolute most, but I

15    can't see it really doing that.

16            THE COURT:  All right.  Do we need to conduct a

17    pretrial conference in the case?  I'm glad to do one if you

18    think it would be helpful.  We haven't got the trial briefs

19    yet, y'all haven't exchanged witness lists and all.  I would

20    be glad to -- you want to do it the day of jury selection,

21    right after?  Miss Floyd, do --

22            MR. MILLS:  We have actually rescheduled a mediation

23    to this next Monday.

24            THE COURT:  Good.

25            MR. MILLS:  So let's see what happens after that.

1        THE COURT:  Do that and then we'll decide.

2            (There was a pause in the proceedings)

3        THE COURT:  Y'all don't need to come back for the bar

4   meeting scheduled on the 20th.

5        MR. MILLS:  Thank you.

6        THE COURT:  Let me know what happens after -- if the

7   mediation is successful let me know.

8        MR. MILLS:  Of course.

9        THE COURT:  And we will draw the jury, as I said, on

10  the 3rd and maybe conduct a pretrial -- assume I don't have a

11  whole lot of juries to select while y'all are already here we

12  might want to go ahead and do a pretrial conference that day.

13       MR. MILLS:  Your Honor, just so I understand, as I

14  understand your ruling on the false arrest claim you just went

15  straight on the qualified immunity, just --

16       THE COURT:  Straight to the merits.

17       MR. MILLS:  Yes, sir.

18       THE COURT:  All right.  Anything further we can take

19  up while y'all are here?

20       MR. MILLS:  No, sir.

21       MR. GARFIELD:  Your Honor, is that dispositive of the

22  state law claims?

23       THE COURT:  State law claims go out as -- well, the

24  state law claim is for --

25       MR. MILLS:  For battery and for false arrest.

46

1          THE COURT:  State law false arrest goes out, the

2    battery claim stays in, same ruling.

3          MR. GARFIELD:  And the battery --

4          THE COURT:  And that leaves the sheriff in his

5    official capacity on the state law claim.

6          MR. GARFIELD:  And would there be a formal order

7    forthcoming, your Honor?

8          THE COURT:  Well, I reserve the right to do a formal

9    order if there's notice of appeal taken.  But I don't see a

10   need to do one right now.  I've got a whole lot to do between

11   now and jury selection.

12         MR. GARFIELD:  I had a checklist to remind myself to

13   ask you.

14         THE COURT:  The clerk will enter a minute order

15   consistent with my ruling.

16         MR. GARFIELD:  Certainly.

17         THE COURT:  All right.  Thank you very much.  Nice to

18   see all of you.

19         MR. MILLS:  Thank you, Judge.

20         (Recess, 3:40 p.m.)

21

22          I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
23

24   Date:  8-23-14                   s/  Daniel E. Mayo

25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

Steve Randall Smith,                        )    C/A: 0:11-2395-JFA
                                            )
                    Plaintiff               )
                                            )
v.                                          )         ORDER FOR
                                            )    INTERLOCUTORY APPEAL
Charles Grant; N.C. Murphy; T.J. Murphy;    )
and Alex Underwood;                         )
                                            )
                    Defendants.             )
_____ )

   By order entered on August 29, 2014, this court granted in part, and denied in part,

defendants' motion for summary judgment. Because that order rejected defendants' defense

of qualified immunity as to one of the two basic claims asserted in this action, defendants

noticed an interlocutory appeal on that portion of the court's ruling.

   The plaintiff has now returned to this court seeking to have this court certify other

issues for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) so as to allow the Fourth

Circuit Court of Appeals to review the entirety of this court's ruling on the summary

judgment motion. For the reasons which follow, the motion is granted.

   As this court's August 29, 2014 order indicates, the claims in this case arose out of

an altercation between two race car drivers who were participating in the annual Shrine Race

at the I-77 Speedway, a dirt track raceway in Chester, South Carolina. Plaintiff, who was one

of the drivers involved in a collision during the race, and had a subsequent altercation with

1

**ATTACHMENT 3**

the other driver, sued four Chester County deputy sheriffs pursuant to 42 U.S.C. § 1983 alleging that they arrested him without probable cause and used excessive force during the course of his arrest. Plaintiff also asserted parallel state law claims for false arrest and battery. This court's order for summary judgment (ECF No. 102) removed two issues (the § 1983 claim for arrest without probable cause and the state law claim for false arrest).

The court has determined that its grant of summary judgment on the false arrest claims is a controlling question of law on that claim as to which there is substantial ground for a difference of opinion. The court also finds that an immediate appeal of the order granting summary judgment on the false arrest claim would materially advance the ultimate determination of this litigation. Moreover, this case is already before the United States Court of Appeals for the Fourth Circuit on the defendants' interlocutory appeal of the qualified immunity ruling on the other half of the case.

For all the foregoing reasons, the court hereby certifies for interlocutory appeal, pursuant to 28 U.S.C. § 2192, its order granting summary judgment to the defendants on the § 1983 claim for arrest without probable cause and the parallel state law claim for false arrest.

IT IS SO ORDERED.

October 9, 2014
Columbia, South Carolina

Joseph F. Anderson, Jr.
United States District Judge

2